83 N.J. Super. 98 (1964)
199 A.2d 37
IN THE MATTER OF THE PETITION OF JOHN T. LIVINGSTON TO SET ASIDE, ANNUL AND REVOKE THE ELECTION OF MANUS J. O'DONNELL FOR THE OFFICE OF BOROUGH COMMISSIONER IN THE BOROUGH OF AVON-BY-THE-SEA, COUNTY OF MONMOUTH, STATE OF NEW JERSEY, AS A RESULT OF THE ELECTION HELD MAY 14, 1963.
JOHN T. LIVINGSTON, PETITIONER-RESPONDENT,
v.
MANUS J. O'DONNELL, INCUMBENT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted February 17, 1964.
Decided March 24, 1964.
*99 Before Judges GOLDMANN, KILKENNY and COLLESTER.
Mr. Joseph F. Mattice, attorney for incumbent-appellant (Mr. Thomas E. Durkin, Jr., Mr. William J. Gearty, of counsel and on the brief).
Mr. Arthur J. Sills, Attorney General of New Jersey Amicus Curiae, pro se (Mr. William L. Boyan, Deputy Attorney General, of counsel).
Mr. Joseph N. Dempsey, attorney for petitioner-respondent.
*100 The opinion of the court was delivered by KILKENNY, J.A.D.
Manus J. O'Donnell appealed from a judgment of the Superior Court, Law Division, entered on June 26, 1963, declaring that John T. Livingston, rather than he, had been elected to fill the third seat on the three-man Board of Commissioners of the Borough of Avon-by-the-Sea, as the result of the municipal election held on May 14, 1963. Harry B. Crook, Jr. and William A. Herbert had, concededly, been elected to fill the other two seats.
O'Donnell had originally been declared the winner over Livingston and had been sworn into office as the third commissioner. He performed the duties of a commissioner and received his official salary until his certificate of election was annulled by the judgment of the Law Division. The salary of a commissioner in Avon is $1,125 per annum.
O'Donnell died on November 4, 1963 while his appeal was pending and before oral argument. On motion made by his attorney, we permitted O'Donnell's widow, as administratrix of his estate, to be substituted as appellant. Livingston opposed the substitution. We felt that the public interest in having only a duly elected person serve as commissioner and the possible claim of O'Donnell's estate to the emoluments of the office prior to his death justified our grant of permission to O'Donnell's administratrix to complete the appeal which he had instituted in his lifetime.
The original tabulation of the voting showed the following results:

 Harry B. Crook, Jr. ........................ 693 votes
 William A. Herbert ......................... 615 votes
 Manus J. O'Donnell ......................... 555 votes
 John T. Livingston ......................... 542 votes
 Henry M. Brewster .......................... 474 votes
 Richard E. Merlino ......................... 154 votes

Based thereon, the board of canvassers declared Messrs. Crook, Herbert and O'Donnell the duly elected commissioners.
Livingston, as a defeated candidate, contested O'Donnell's election and petitioned the Superior Court, Law Division, *101 pursuant to N.J.S.A. 19:29-1 et seq., to annul the certificate of election issued to O'Donnell and to direct a certification that he had been elected. He claimed that 54 of the 94 nonmilitary absentee ballots had been rendered void by reason of the fact that 51 of them had been notarized by candidate Crook, 2 by candidate O'Donnell and 1 by candidate Brewster. No question was raised as to the military absentee ballots.
Following a hearing in the Law Division, the trial court declared invalid all of the 94 nonmilitary ballots. The 54, admittedly notarized by the three candidates, were declared void solely because they were so notarized. Since they constituted the majority of the civilian absentee ballots which were cast and could not be disassociated from the remainder, the entire civilian absentee vote was nullified. Such action was taken in reliance upon In re Donahay's Contested Election, 21 N.J. Misc. 360, 34 A.2d 299 (Cir. Ct. 1943).
The civilian absentee votes were distributed among the candidates as follows:

 Harry B. Crook, Jr. ............................... 71
 William A. Herbert ................................ 41
 Manus J. O'Donnell ................................ 56
 John T. Livingston ................................ 29
 Henry M. Brewster ................................. 29
 Richard E. Merlino ................................ 12

Nullification of all 94 civilian absentee votes reduced the total vote of each of the candidates by the number of civilian absentee votes each had received, thus making the vote tabulation:

 Harry B. Crook, Jr. .............................. 622
 William A. Herbert ............................... 574
 John T. Livingston ............................... 513
 Manus J. O'Donnell ............................... 499
 Henry M. Brewster ................................ 443
 Richard E. Merlino ............................... 142

On those revised figures, Messrs. Crook, Herbert and Livingston were declared the duly elected commissioners and the *102 certificate of election theretofore issued to O'Donnell was annulled by judgment of the Law Division. O'Donnell's appeal followed.
The basic issue before us is whether civilian absentee ballots are rendered void, if the statutorily required certification on the flap of the return envelope by one capable of administering an oath is executed by a notary public, whose name appears on the ballot as a candidate. The secondary issue is whether notarization by one candidate can per se invalidate absentee ballots cast in favor of another candidate. The two absentee ballots notarized by O'Donnell and the one notarized by Brewster would not have altered the original results. The crucial ballots are the 51 upon which Candidate Crook certified compliance with the law. Should these, and the remainder of the 94 civilian absentee ballots, be invalidated? If not, O'Donnell's certificate of election should not have been annulled.
Our absentee voting law, N.J.S.A. 19:57-1 et seq., requires the voter to exhibit his absentee ballot unmarked to a person authorized by law, of the place where the oath is administered, to administer oaths, and then, in the presence of such officer and in the presence of no other person and in such manner that the officer cannot see his vote, to mark the ballot and enclose and seal it in the envelope without the officer's seeing or knowing his vote. On the flap of the envelope in which the ballot is placed for return and count by the county board of elections, there is a certificate which must be executed by the officer, showing compliance with the foregoing requirements and also stating that the voter was not solicited or advised by the officer to vote for or against any candidate or proposition. N.J.S.A. 19:57-17.
Concededly, there is no provision in the statute expressly prohibiting candidates from administering oaths and completing these flap certificates, if they are duly authorized to administer oaths by the law of the place where the oath is administered. The authority of candidates Crook, O'Donnell and Brewster to administer oaths by the law of the place *103 where the oaths in issue were administered by them, has not been questioned.
The Law Division rested its conclusion, that candidates were precluded from performing the statutorily required notarial function, on the ground that the Election Law impliedly banned such conduct. Its rationale was that the secrecy of the ballot and the voter's freedom of choice would be endangered if candidates were permitted to perform this function. To allow a candidate to be present and alone with the absentee voter while he is marking his ballot would, according to the trial court, subject the voter to possible coercion or corruption and undermine public confidence in our election process. The trial court found an analogy between the duties performed by members of a district board of elections, on which a candidate may not sit, R.S. 19:6-12, and those of the certifying officer under the absentee voting law.
The trial court also deemed significant the language in the officer's certification, that "the affiant was not solicited or advised by me to vote for or against any candidate or proposition." (Emphasis supplied) It found that "the italicized portion of this statement leads irresistibly to the conclusion that the Legislature intended that the certifying officer be a non-participant in that election." It reasoned that if a candidate could act as a certifying officer, his certification would have been worded by the drafters of the law to include a statement that the officer "did not solicit a vote for himself" as well as "for or against any candidate or proposition."
That the drafters of the law would have included this additional verbiage in the certification is speculative, at best. The all-comprehensive "any candidate" is adequate enough to include the certifying officer. Hence, we do not find in the language used any clear evidence of a legislative intent to prohibit candidates from acting as the certifying officer.
The analogy drawn by the trial court between a member of a district board of elections and a notary completing the envelope flap certificate is of doubtful validity. The Attorney General, in his brief as amicus curiae, points out that district *104 boards of election have much wider functions and greater responsibilities at the polls than do notaries in the case of civilian absentee voting. The district boards are responsible for opening and closing the polls at the proper times, R.S. 19:15-2, R.S. 19:23-47; assuring that only official ballots are used, and restricting the use of emergency or unofficial ballots to those situations in which the law permits their use, R.S. 19:15-4 to 6, R.S. 19:15-29; determining whether the voter who presents himself at the polls is properly registered, as shown by the "signature copy registers" in their custody and control, R.S. 19:15-17 and 25, N.J.S.A. 19:31-21, N.J.S.A. 19:31-20; returning the registers to the commissioners of registration after the election, N.J.S.A. 19:31-22; entertaining and determining challenges to the right of a person to vote, R.S. 19:15-18 to 24; counting the votes at the close of the polls, when paper ballots are used, N.J.S.A. 19:16, and making sure that the counters are originally set at zero when voting machines are used, N.J.S.A. 19:52-1, recording the readings at the close of the polls, R.S. 19:52-5, and then locking the machines, N.J.S.A. 19:52-6.
In the case of absentee voting, the notary does not perform any of the foregoing duties. His sole function is to complete the jurat and certification required by N.J.S.A. 19:57-17. The many quasi-judicial and administrative responsibilities of district boards of election, including determinations of the right to vote, the legal effect of markings on paper ballots, the supervision of conduct at the polls and the tabulation of the vote, give understanding to the express legislative pronouncement that a candidate may not be a member of a district board of elections. R.S. 19:6-12. The much more limited scope of the notary's substantially ministerial act in connection with absentee voting does not warrant a finding, by necessary implication, that the Legislature intended candidates to be similarly disqualified from performing that essentially non-judicial act.
We recognize the potential harm in allowing a candidate to act as the certifying officer in the case of absentee ballots. *105 But the potentiality of coercion, corruption and violation of the secrecy of the ballot is present, no matter who acts as the certifying officer. The difference, at most, is one of degree, whether the certifying officer is a candidate, the candidate's wife, son or secretary, or some loyal and zealous adherent. To exclude every candidate as a certifying officer and disenfranchise absentee voters because some candidate signed the flap certificates, attesting to full compliance with the law, while upholding similar ballots where the certificates were signed by a relative, friend or party worker, would exalt form over substance. The Legislature has not made any such distinction. To do so by judicial decree would, in our judgment, constitute unwarranted judicial legislation.
If the Legislature wanted to prohibit candidates from acting as certifying officers, it would have been a simple matter for it to expressly so provide. The Massachusetts legislature expressly outlawed the practice. See McRobbie v. Registrars of Voters of Ipswich, 322 Mass. 530, 78 N.E.2d 498 (Sup. Jud. Ct. 1948); G.L. (Ter. Ed.) c. 54, § 92, as amended Stat. 1945, chap. 466, § 4.
In North Carolina, where, as here, there is no statute expressly outlawing the practice, the Supreme Court decided that four absentee ballots were not vitiated merely because the voters had subscribed the required affidavits before the Clerk of the Superior Court, who was a candidate for re-election and whose election was in issue before the court. The court found that the ballots expressed the free choice of the voters. It said, "It may be that a due sense of propriety would have induced the defendant [clerk] to refrain from administering the oath to these voters. We are unable, however, to concur in the ruling of the court rejecting these ballots." Owens v. Chaplin, 228 N.C. 705, 47 S.E.2d 12, 16 (Sup. Ct. 1948).
There was no finding in this case that the disputed 54 civilian absentee ballots did not express the free choice of the voters. Only as to one absentee voter, a Mrs. Laile, was there any testimony of possible untoward conduct by the certifying *106 officer, candidate Crook. Her husband, 83 years old, testified that he was present when his almost blind wife voted as an absentee voter in the presence of Mr. Crook. He said that Mr. Crook asked Mrs. Laile to vote for himself and Mr. O'Donnell, showed her where to place her mark in the boxes next to their names, and then she made the marks by herself. L. 1963, c. 22, approved April 8, 1963, N.J.S.A. 19:57-2, 18, 23, provides that a blind absentee voter shall be entitled to assistance in the marking of his ballot. There was no showing that Mrs. Laile's vote did not represent her free choice. Even if her ballot were declared invalid, because her vote was allegedly solicited by the certifying officer, that single incident was not sufficient to alter the result.
The Attorney General suggests in his brief that, if inquiry were made as to what the existing practice is, "very many instances could be found of candidates for various offices in both major parties and other political groups acting as a notary public on a civilian absentee ballot." Proof of such a widespread practice does not appear in the record and the matter is not one of which we might take judicial notice. Moreover, if the practice is in common use and contravenes the law, its continuance may not be condoned. Compare the recent rulings by the United States Supreme Court invalidating inequitable legislative apportionment and unconstitutional arrangements of congressional districts, despite the long-continued existence of such local practices and gerrymandering.
The trial court made reference to a presentment handed up by the Atlantic County grand jury on February 21, 1963, in which it observed that the absentee voting law is "mostly honored in the breach. Too often the ballot is not secretly voted and in many instances it is taken by the political worker to some notary public to notarize the accompanying voter's certificate." The trial court also noted that there was presently pending in the State Assembly a bill, A-579, which would amend the Absentee Voting Law to exclude notaries public as a class of persons authorized to administer oaths to absentee voters. However, this bill contains no provision prohibiting *107 a candidate from serving as the certifying officer. Whatever may be said as to the desirability of strengthening the Absentee Voting Law to insure the secrecy of the ballot and to protect the absentee voter from undue pressure, be it by the candidate himself or by some political worker, the need for and wisdom of amendments to the law are matters within the special province of the Legislature.
The Legislature has provided that the absentee voting law shall be liberally construed to effectuate the rights of the voters. N.J.S.A. 19:57-36 provides:
"No election shall be held to be invalid by reason of any irregularity or failure in the preparation or forwarding of any absentee ballots pursuant to the provisions of this act."
"Election laws are to be liberally construed so as to effectuate their purpose. * * * They should not be construed so as to deprive voters of their franchise or so as to render an election void for technical reasons." Kilmurray v. Gilfert, 10 N.J. 435, 440 (1952). See too, Wene v. Meyner, 13 N.J. 185 (1953); In re Moore, 57 N.J. Super. 244 (App. Div. 1959); and In re Farley, 78 N.J. Super. 349 (App. Div. 1963), certif. den. 40 N.J. 220 (1963), in which our courts have declared that unwitting omissions of formal requirements of the absentee voting law are not sufficient to overturn the expression of the popular will. "An election is not vitiated by the defaults of election officers not involving malconduct or fraud, unless it be shown that thereby the free expression of the popular will in all human likelihood has been thwarted." Wene v. Meyner, supra, 13 N.J., at p. 196.
The following language from Bliss v. Wooley, 68 N.J.L. 51, 54 (Sup. Ct. 1902), is most appropriate here:
"The right of suffrage is too sacred to be defeated by an act for which the voter is in no way responsible, unless by the direct mandate of a valid statute no other construction can be given."
Cf. Sharrock v. Borough of Keansburg, 15 N.J. Super. 11, 16-17 (App. Div. 1951), where a specific statutory provision was violated.
*108 The Absentee Voting Law does not furnish any direct mandate requiring a nullification of the civilian absentee ballots in issue. There was no finding of fraud. Indeed, the record is barren of proof of fraud and the petitioner did not even charge it in his petition. The trial court found the testimony as to Mrs. Laile sufficient to sustain a charge of "sharp practice." But this isolated incident would not support an inference that the other absentee votes were similarly tainted. No such evidence as to the other 50, for which Mr. Crook also acted as the notary, was offered at the hearing.
Counsel for Livingston cites a few out-of-state decisions which deserve comment. Supporting his view is Schirmer v. Myrick, 111 Vt. 255, 20 A.2d 125 (Sup. Ct. 1941), which held that a candidate's interest in his nomination is such that he is disqualified from administering the required oath to signers of his own nomination petition. That decision was concerned only with the validity of the nominating petition of a Communist candidate for Congress. It did not entail the nullification of votes cast by absentee voters, whose instructions did not contain any direction that the required notarial certificate must be by someone other than a candidate. State ex rel. Hanson v. Wilson, 113 Wash. 49, 192 P. 913 (Sup. Ct. 1920), is not apposite. There, the wife of a candidate went into the booth with six voters and assisted them in marking their ballots, even though they were not disabled, in direct violation of the statute. The six votes were declared illegal. In State ex rel. Pemberton v. Superior Court of Whatcom County, 196 Wash. 468, 83 P.2d 345 (Sup. Ct. 1938), it was held inter alia, that (1) the private secretary of a candidate was not disqualified from taking acknowledgments of absentee voters on the outer envelopes; and (2) absentee ballots marked by the candidate's wife or with her assistance were illegal. The facts in that case are readily distinguishable.
The Pemberton case contains the significant observation that "courts should not be too ready to reject ballots or votes on account of the violation of technical requirements, especially *109 in the absence of a charge of fraud, lest, in so doing, they disfranchise persons who voted in entire good faith." 83 P.2d, at p. 350. As the court said in People ex rel. Hirsh v. Wood, 148 N.Y. 142, 42 N.E. 536, 537 (Ct. App. 1895), in expressing its opposition to the disfranchisement of innocent voters for the mistake, or even the willful misconduct, of election officials in performing the duty cast upon them:
"The object of elections is to ascertain the popular will, and not to thwart it. The object of election laws is to secure the rights of duly-qualified electors, and not to defeat them."
It is our conclusion that the action of Mr. Crook in performing the ministerial duty of a notary did not, per se, render null and void the 51 ballots of the absentee voters for whom he rendered this service. If such practice carries the potential of abuse, let the Legislature consider the need of an appropriate remedy. Absent any showing of fraud or that the ballots cast did not represent the free choice of these voters, there was no valid reason for their disfranchisement.
Having decided that candidate Crook's notarizing the certificates did not per se vitiate the 51 absentee ballots so serviced by him, it becomes unnecessary to decide the applicability of the rule laid down in the case of In re Donahay's Contested Election, noted above. So, too, we do not reach the issue as to whether Crook's conduct is imputable to O'Donnell, merely because they campaigned as a team and were presumably interested in their mutual election in order to enjoy political control of the three-member board of commissioners. In this regard, see N.J.S.A. 19:3-9; McGuffin v. Maurer, 99 Cal. App.2d 183, 222 P.2d 486, 487 (Cal. D. Ct. App. 1950). Query: would such an act by a candidate for the office of district county committeeman vitiate ballots upon which absentee voters had expressed their choices of candidates for many offices, merely because the county committee candidate was running with the others as part of the organization team?
For the reasons above stated, the judgment of the Law Division is reversed. Manus J. O'Donnell, and not John T. *110 Livingston, was the duly elected commissioner as the result of the May 14, 1963 election. His death, before the expiration of the term, leaves a vacancy in the office to be filled as provided by law. An appropriate order may be entered in conformity herewith.
We make no determination as to whether O'Donnell was entitled to the emoluments of the office up until the time of his death, because of the absence herein of a necessary party interested in that issue, viz., the municipal corporation, the Borough of Avon-by-the-Sea.